Theodore R. McMILLIN, Jr., Appellant,

v.

L.D.L.R., Appellee.

No. 1974cv.

Court of Appeals of Texas, Corpus Christi.

Oct. 28, 1982.

Rehearing Denied Nov. 18, 1982.

---

Scott T. Cook, Harris, Cook & Browning, Corpus Christi, Thomas H. Crofts, Groce, Locke & Hebdon, San Antonio, Paul Q. O'Leary, O'Leary, Sanchez & Benton, P.C., Brownsville, for appellant.

R.K. Whittington, Stapleton & Whittington, Alex Huddleston, Skaggs & Huddleston, Harlingen, for appellee.

Before BISSETT, YOUNG and KENNEDY, JJ.

## OPINION

KENNEDY, Justice.

This is a medical malpractice case instituted by appellee against Drs. Theodore McMillin and Jackie Stephenson, arising out of an operation performed upon him. Dr. McMillin is the only appellant before this Court.

The testimony from the trial court is voluminous. Stated as briefly as possible, the facts are as follows: Appellee, a man of

42 years at the time of trial, had been suffering recurring problems with a stricture, or obstruction, in his urethra since his late teens or early twenties. The urethra is that portion of the male urinary tract which carries urine from the bladder through the penis to the meatus or opening at the head of the penis, so that it may be passed. The recurring stricture thus impeded appellee's ability to urinate, and had necessitated periodic visits to a doctor who, by the insertion of instruments called "sounds," was able to restretch the urethra at the point of stricture and alleviate the problem.

In 1975 appellee, having heard of various procedures which might remedy his problem once and for all, made an appointment to see Dr. Stephenson, a urologist. Dr. Stephenson was engaged in practice with Dr. McMillin. Appellee testified that he had heard of both Drs. Stephenson and McMillin, and was aware that they were in practice together, but that it was Dr. Stephenson to whom he had been referred, and Dr. Stephenson with whom he wished to consult.

The operation which was discussed, and eventually performed, is known as a Devine patch graft urethroplasty, and entails the removal of the affected portion of the urethra and the reconstruction of it using a skin graft. When available, the foreskin of the penis is the preferred donor site for the skin graft. When unavailable, as with a circumcised man such as appellee, a strip of skin may be taken from the shaft of the penis itself. Drs. Stephenson and McMillin followed the latter procedure.

The results of the operation, performed by Dr. Stephenson with Dr. McMillin assisting, were, as far as appellee was concerned, disastrous. He felt that his penis was deformed, and it was necessary for him to have a second operation performed by a Houston plastic surgeon, Dr. Raymond Brauer, seven months later. Dr. Brauer stated that when appellee came to him, his penis was exceptionally short for a man of his size, and that appellee was complaining of constriction and pain upon erection. The evidence firmly established that the Devine patch graft procedure should not result in the shortening of the penis.

Dr. Brauer found that the shaft of appellee's penis had been retracted into the abdominal wall, to which he attributed the painful restriction appellee felt during erection. Dr. Brauer released the shaft from its retracted position, and grafted a new piece of skin to the penis itself to replace that taken during the first operation and used for reconstructing the urethra.

In response to special issues the jury found appellee entitled to $10,000 for time lost from work in the past, and for past and future medical expenses. For past and future physical pain and mental anguish the jury awarded appellee $800,000. Liability was predicated upon the following findings:

1. That Dr. McMillin failed to explain to appellee the operative procedure or those risks, complications, dangers, or hazards of the Devine patch graft urethroplasty which would have been explained by a reasonable medical practitioner of the same school and in the same or similar community under the same or similar circumstances situated as was Dr. McMillin.

2. That had these risks, complications, etc. been properly explained, appellee, acting as a reasonably prudent person, would not have permitted Drs. Stephenson and McMillin to perform the operation.

3. That Dr. Stephenson was negligent in removing a greater amount of skin from the shaft of the penis to be used as a skin graft than was necessary, and that such was a proximate cause of appellee's injuries.

4. That Dr. McMillin was negligent in failing to warn Dr. Stephenson during the operation that he was removing too much skin from appellee's penis, and that such was a proximate cause of appellee's injuries.

5. That Dr. Stephenson was negligent in failing to replace the skin taken from the shaft of the penis with a skin graft from some other portion of appellee's body, and that such was a proximate cause of appellee's injuries.

6. That Dr. McMillin was negligent in failing to warn or advise Dr. Stephenson

during the operation that he should replace the skin removed from the penis with a skin graft from some other portion of appellee's body, and that such a proximate cause of appellee's injuries.

7. That Dr. Stephenson was negligent in sewing the appellee's scrotal skin to a point at the level of the corona of his penis, and that such was a proximate cause of appellee's injuries.

8. That Dr. McMillin was negligent in failing to warn Dr. Stephenson during the operation that he should not sew the scrotal skin to a point at the level of the corona of appellee's penis, and that such was a proximate cause of appellee's injuries.

 In ten points of error Dr. McMillin attacks the judgment. We will first address points seven, eight and nine which attack both the legal and factual sufficiency of the evidence to support the jury's finding concerning, respectively, the amount of skin removed from appellee's penis, a replacement skin graft, and the sewing procedure. In determining the merits of the no evidence points we consider only the evidence and inferences tending to support the trial court's findings and disregard any contrary evidence and inferences. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.

1965); *Bodine v. Welders Equipment Co.,* 520 S.W.2d 407, 411 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.). In reviewing the contentions that the evidence is factually insufficient to support the findings of the lower court, we will review all of the evidence and set the verdict aside if it is manifestly unjust. *In re Kings Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1952); *Bodine v. Welders Equipment Co.,* supra.

 It is incumbent upon the plaintiff in a malpractice action sounding in negligence to show by expert testimony that the acts complained of were such as would not have been performed by a medical practitioner of the same school practicing in the same locale. See *Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1966); *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949). This burden of proof regarding negligence, as well as that regarding probable cause, can be established by circumstantial evidence. *Birmingham v. Gulf Oil Corp.,* 516 S.W.2d 914, 917 (Tex.1974); *Lynch v. Ricketts,* 158 Tex. 487, 314 S.W.2d 273, 275–6 (1958).

As regards the findings concerning the amount of skin removed from appellee's penis, the evidence tended to show that the strip removed was a band measuring twelve centimeters by three centimeters, or the following size:

There were a number of expert witnesses, some of whom had examined appellee personally, and some of whom had not. Among the former was Dr. Brauer who testified that a three centimeter strip is a "pretty good sized strip' but would not necessarily be too much depending on how much penile skin was available. He stated that the fact that he found the shaft of the penis retracted into the abdominal wall could be attributable to the remaining penile skin having been stretched upward to cover the area from which the graft had been taken. Testimony by Dr. Brauer and others, including Dr. Charles J. Devine, Jr. after whom the Devine patch graft urethroplasty was named, showed that given that not too much skin is removed from the penis for grafting purposes, this stretching upward of the skin closer to the base of the

organ to cover the denuded area is an acceptable operating procedure, which may result in a penis that appears shorter cosmetically, but which in fact is not because the shaft remains unchanged. In the instant case, however, the shaft did not remain unchanged. Dr. Brauer opined that the retracted shaft could be due to the removal of too much skin for the graft, resulting in insufficient remaining skin to accomodate the shaft when stretched upward. Dr. McMillin stated that if too much skin is removed, erection will not be comfortable and will result in the bending of the penis. This effect is called "bowstringing." Dr. Brauer's testimony was substantially the same, and established that appellee was suffering this effect. The jury was entitled to infer from this evidence that too much skin had been removed, and that such was a proximate cause of appellee's injuries.

As concerns the findings regarding failure to replace the skin removed from appellee's penis, the expert testimony, including that of Dr. McMillin, established that if too much skin is removed from the donor site, it should be replaced by grafting skin taken from another appropriate donor site, such as the abdomen. Upon releasing appellee's penis during the second operation, this is precisely what Dr. Brauer did. This evidence, coupled with the evidence supporting the previous findings, supports these findings.

The last act occurring during the course of the operation which the jury found to be negligence and a proximate cause of appellee's injuries was the suturing of appellee's scrotal skin to a point at the level of the corona of his penis. The corona is the area just below the glans, or head, of the penis. Dr. Stephenson stated uncategorically that no reasonable practitioner would do such a thing. The testimony of Dr. Brauer, together with records he made, and photographs taken of appellee prior to the second operation show that this was done. The evidence is clearly sufficient to support these jury findings.

While the above acts were negligent and each a proximate cause of appellee's injuries, Dr. McMillin's liability must be predicated upon a duty to warn or advise Dr. Stephenson during the operation not to perform those acts, since Dr. Stephenson was the lead surgeon with Dr. McMillin simply assisting him. Both men testified that if Dr. Stephenson had been doing something wrong—such as removing too much skin without grafting new skin to the penis, or sewing the scrotal skin to the corona—that it would have been expected of Dr. McMillin to speak up and say so to Dr. Stephenson. The evidence showed that consultations at the operating table between the two were a common occurrence.

In a medical malpractice action the duty devolving upon physicians can be established by the testimony of the defendants themselves. *Wilson v. Scott,* 412 S.W.2d 299, 303 (Tex.1967); *Smith v. Guthrie,* 557 S.W.2d 163, 165 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n.r.e.). Having found that the acts complained of were in fact performed, and that each constituted negligence and a proximate cause of appellee's injuries, we hold that the evidence was also sufficient to allow the jury to find that Dr. McMillin had a duty to warn Dr. Stephenson not to perform them as he did, and that that duty was breached. Furthermore, they were entitled to impliedly find that had he done so his advice would have been heeded, and that his failure to do so was therefore a proximate cause of appellee's injuries. Points of error seven through nine are overruled.

Dr. McMillin's liability was also predicated upon the jury's findings that he failed to explain to appellee the operative procedure or those risks, complications, dangers, or hazards of the Devine patch graft urethroplasty which would have been explained by a reasonable medical practitioner of the same school and community, and situated under the same or similar circumstances; and that had he done so appellee would not have permitted the operation.[1] This is known as the doctrine of informed consent.

---

1. Similar findings were made concerning Dr. Stephenson as well.

*Roark v. Allen,* 633 S.W.2d 804, 808 (Tex. 1982).

The precise duty which devolves upon an assisting surgeon to conform with the requirements of the doctrine is an unclear area of law. See, e.g., *Karp v. Cooley,* 493 F.2d 408, 422, n. 19 (5th Cir.1974) (wherein it is stated that team members of a surgical unit are entitled to rely on the consent obtained by the doctor in charge of the operation); *Weiser v. Hampton,* 445 S.W.2d 224, 230 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.) (wherein the court refused to apply the doctrine to a resident physician employed by the hospital where the operation was performed who assisted the defendant orthopedic surgeon). None of the cases we have reviewed from this or any other jurisdiction are on all fours with the case at bar.

■ However, the finding is not essential to the judgment, and Dr. McMillin's point of error in which he contends that he owed no duty under the doctrine need not be addressed. There may be more than one producing cause of an injury. *Dover Corp. v. Perez,* 587 S.W.2d 761, 764 (Tex.Civ.App. —Corpus Christi 1979, no writ). Where such is the case, and each is an efficient cause without which the injury would not have occurred, then the injury may be attributed to all or any of the causes. Id. at 765; *South Austin Drive-In Theater v. Thomison,* 421 S.W.2d 933, 952 (Tex.Civ. App.—Austin 1967, writ ref'd n.r.e.). As has already been noted, four acts of Dr. McMillin were found to have been proximate causes of appellee's injuries, and we have sustained the findings regarding three of them. Point of error number five is overruled.

Our disposition of point of error number five also renders superfluous points numbers four and six which complain, respectively, of the form in which the informed consent issue concerning Dr. McMillin was submitted, and of the trial court's allowing appellee to file a trial amendment in which informed consent was stated as a basis of recovery against Dr. McMillin.

■ We next turn our attention to Dr. McMillin's first three points of error in which complaint is made regarding the size of the jury's award for past and future physical pain and mental anguish, and the trial court's failure to order a remittitur. In determining whether an award of damages is so excessive as to require a remittitur:

"All the Court of Civil Appeals can do, and all that is required of it to do . . . is to exercise its sound judicial judgment and discretion in the ascertainment of what amount would be reasonable compensation for the injuries sustained, and treat the balance as excess. . . . [Having] decided upon an amount that would be reasonable compensation . . . it should authorize a remittitur of the excess . . . in accordance with its sound judgment." *Flanigan v. Carswell,* 159 Tex. 598, 324 S.W.2d 835, 840 (1959); *Wilson v. Freeman,* 108 Tex. 121, 185 S.W. 993, 994 (1916).

In determining whether a remittitur should have been granted, this Court will review only the evidence favorable to the verdict and the jury's determination will not be disturbed if there is any evidence to sustain it. E.g., *Roberts v. Tatum,* 575 S.W.2d 138, 140–41 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); *Wharf Cat, Inc. v. Cole,* 567 S.W.2d 228, 230 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Atchison, Topeka & Santa Fe Ry. Co. v. McCartney,* 549 S.W.2d 228, 230 (Tex.Civ.App.—Beaumont 1977, writ ref'd n.r.e.); *Hammond v. Stricklen,* 498 S.W.2d 356, 363 (Tex.Civ.App. —Tyler 1973, writ ref'd n.r.e.). The record, as reflected by the amount of the award itself, must show that the minds of the jurors were so controlled by passion, prejudice, or bias as made them unwilling to consider the case on its merits, to the end result that the award is so excessive that it shocks the conscience of this Court. *Wharf Cat, Inc. v. Cole,* supra. "In the end, it is a judgment call on our part whether the jury award is supported by the evidence. And each case stands on its own bottom." *Atchison, Topeka & Santa Fe Ry. Co. v. McCartney,* supra, 549 S.W.2d at 229.

■ That evidence which supports the jury's award includes the following: After the first operation appellee had no effective

control over his urinary stream due to the fact that it was passing from an opening at the base of his penis near the scrotum as well as from the meatus. This necessitated appellee's having to sit to urinate. He recalled times in public restrooms when he attempted to use a urinal, and ended up spraying the person beside him. On occasion he found it necessary to leave meetings and go home to change his trousers due to leakage from this new aperture.

Because erection was so painful for him, he was unable to engage in sexual intercourse with his wife. He described the emotional trauma he experienced as a result of this, and the fact that his penis was so dramatically diminished in size. The concern that he reiterated was that his "manhood" had been taken from him, and that he would never be a man again.

Despite the fact that the second surgery was scheduled and assurances concerning its hoped for results given, appellee was very apprehensive regarding it, and experienced prolonged fears and worries. As previously noted, Dr. Brauer found it necessary to graft skin from appellee's abdomen to the portion of his penis from which skin had been removed when he released the penile shaft. Due to the lack of nerve endings in the skin graft, appellee experiences numbness in that area of his penis. His sexual problems were continuing at the time of trial.

Also due to the need for a new skin graft, appellee's penis is scarred. He experiences pain within his penis on a regular basis severe enough to awaken him in the middle of the night. His problem with recurring strictures still has not been remedied.

There are no certain standards by which awards for physical pain and, (more importantly in this case, we believe,) mental anguish can be measured, and comparisons with amounts awarded in other cases proves to be of little or no help. *Gonzales v. Southwestern Bell Tel. Co.,* 555 S.W.2d 219, 223 (Tex.Civ.App.—Corpus Christi 1977, no writ). The jury is left with wide discretion in fixing the amount. *Wharf Cat, Inc. v. Cole,* supra; *Gonzales v. Southwestern Bell Tel. Co.,* supra. Due to the very character of the injuries sustained by appellee here, that is, the deeply personal nature of the injuries themselves and their devastating emotional and psychological effects, we are not prepared to declare the amount awarded to be excessive.

The party seeking remittitur need not make an affirmative, extraneous showing of passion or prejudice or improper motivation on the part of the jury in order to prevail. *Flanigan v. Carswell,* supra, 324 S.W.2d at 841; *Argonaut Insurance Co. v. ABC Steel Products Co., Inc.,* 582 S.W.2d 883, 889 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.). Dr. McMillin nonetheless urges this Court to recognize the existence of such. It was shown at the hearing on the motion for new trial that prior to the answering of the damages issue, the fact that Carol Burnett had received a large reward recently in a libel suit was brought up by one of the jurors. The testimony of three of the four jurors who testified at the hearing indicated that the subject was mentioned once or twice, and immediately dropped when the foreman admonished the speaker.

Whether the act alleged to be misconduct occurred or, as in this case, the extent to which it occurred, is a question of fact, and the express or implied finding of the trial court in that regard is ordinarily taken as final. *Argonaut Insurance Co. v. ABC Steel Products Co., Inc.,* supra, 582 S.W.2d at 888. The trial court's finding that the mention of the Carol Burnett case did not influence the jury will not be upset. Points of error numbers one, two and three are overruled.

In his final point of error Dr. McMillin contends that the trial court erred in refusing him indemnity or contribution against Dr. Stephenson. As regards the former, the doctrine of common-law indemnity between joint tortfeasors has been abolished in this State. *B & B Auto Supply, Sand Pit & Trucking Co. v. Central Freight Lines, Inc.,* 603 S.W.2d 814, 817 (Tex.1980). That case, however, does not express opinion as to the availability of

indemnity where a party's liability is purely vicarious. *Id.* It was this basis for relief that was pled by Dr. McMillin in his cross-action against Dr. Stephenson. It is a theory that is not applicable to this case. The law as stated by this Court in *Krishnan v. Garza,* 570 S.W.2d 578 (Tex.Civ.App.—Corpus Christi 1978, no writ) is directly on point. As with the defendants in that medical malpractice case, Dr. McMillin's liability is determined by his own acts or omissions; his negligence was not the sole cause of appellee's injuries; he and Dr. Stephenson are joint tortfeasors; either one or both could have prevented the injuries, and neither did. *Id.* at 582. Dr. McMillin is not vicariously liable by operation of law. *Id.*

Indemnity being unavailable, relief, if any, must be afforded through statutory contribution, Article 2212 of our Revised Civil Statutes. See *Strakos v. Gehring,* 360 S.W.2d 787, 798 (Tex.1962); *Krishnan v. Garza,* supra, 570 S.W.2d at 582. The relief provided for therein, however, must be supported by sufficient pleadings. *Hampton & Kennedy Lumber Co. v. Whitfield,* 213 S.W.2d 152, 154 (Tex.Civ.App.—Texarkana 1948, no writ). As previously noted, Dr. McMillin's cross-action prayed for indemnity predicated upon his alleged vicarious liability. Vicarious liability is an approach used to establish common-law indemnity. *Strakos v. Gehring,* supra; *Krishnan v. Garza,* supra. As such, it is mutually exclusive from statutory contribution. Tex.Rev.Civ. Stat.Ann. Art. 2212. Therefore, this avenue of relief is closed as well. Point of error number ten is overruled, and the judgment of the trial court is AFFIRMED.